# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ANGEL L. APONTE,**

        **Plaintiff,**

v.                                                          Case No:   6:18-cv-161-Orl-22GJK

**BROWN & BROWN OF FLORIDA, INC.,**

        **Defendant.**

## MEMORANDUM OPINION

On April 2 and 3, 2019, the Court held a two-day bench trial in this case.[1] The sole remaining claim for trial was Plaintiff Angel L. Aponte's interference claim under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, based on Defendant Brown & Brown of Florida, Inc.'s ("B&B") termination of Aponte's employment after he requested FMLA leave. The Court has carefully reviewed the facts to which the parties stipulated before trial, the trial testimony, the exhibits admitted at trial, the proposed findings of fact and conclusions of law submitted by the parties, arguments submitted post-trial, and the relevant law. The Court issues the following Findings of Fact and Conclusions of Law in accordance with Fed. R. Civ. P. 52. For the reasons discussed below, the Court finds that B&B has established its "same decision" affirmative defense and is entitled to judgment in its favor.

## I. FINDINGS OF FACT

This case stems from B&B's termination of Aponte's employment based on his failure to fulfill B&B's licensing requirement. Aponte worked for B&B for approximately eighteen months,

---

[1] On February 21, 2019, the Court rejected Aponte's jury trial demand because Aponte knowingly and voluntarily waived his Seventh Amendment right to trial by jury. (Doc. 48). Therefore, the Court set the matter for a bench trial. (*Id.*)

from October 5, 2015 to March 3, 2017. (Doc. 44 at 37–38). B&B is an insurance provider with over 285 profit centers and 10,000 employees across the United States, Canada, and England. (Doc. 70 at 80, 109, & 145).

In August 2015, Aponte accepted B&B's job offer for an Inside Sales/Sales Associate position in its Orlando, Florida office, notably the email containing the job offer did not state that Aponte was required to have a 2-20 license.[2] (Doc. 71 at 11 & Plaintiff's Exhibit 6 ("Pl.'s Ex.")). During Aponte's employment, he worked in the Personal Lines Department and directly reported to his supervisor, Kathy Beck, the Personal Lines Manager, Team Leader.[3] (Doc. 70 at 22, 42–43, & 119). Beck reported directly to Peter Matulis, the Executive Vice President and Profit Center Leader in the Orlando office. (*Id.* at 25, 51, 80, 109, & 119).

On October 5, 2015, Aponte's first day of work, he signed a job description which stated that a property and casualty 2-20 license was required for his position. (Doc. 71 at 14, 60–63, & Pl.'s Ex. 8). On October 6, 2015, Beck emailed Aponte, confirming that his position required him to have a 2-20 license and instructing Aponte that he would need to obtain a 2-20 license within the next twelve months, no later than October 5, 2016. (Doc. 70 at 44–45; Doc. 71 at 15 & Pl.'s Ex. 9).

From the beginning of his employment, Aponte understood that this was a requirement for his job and that if he did not obtain the 2-20 license within a year, he would be terminated. (Doc. 71 at 60–63). This requirement did not change during his employment at B&B. (Doc. 70 at 43). The requirements for obtaining a 2-20 license include: being fingerprinted, completing 200 hours of coursework, and passing the 2-20 exam. (Doc. 70 at 113 & 201; Doc. 71 at 65). After completing the coursework, a person becomes eligible to take the 2-20 exam. (Doc. 71 at 104). To pass the

---

[2]The parties refer to this office interchangeably as the "Orlando" or "Maitland" office. For clarity, the Court refers to this as office as the Orlando office.
[3]Previously, Beck was Aponte's direct supervisor at Sihle Insurance and she hired him at B&B. (Doc. 70 at 23–24). Beck considers Aponte to be her friend. (*Id.* at 41–42).

examine, an examinee needs to score at least a 70%. (Doc. 70 at 113; Doc. 71 at 30, 71 & Def's Exs. 18–21). The State of Florida allows examinees to take the 2-20 exam a maximum of five times within a year. (Doc. 70 at 85 & 201; Doc. 71 at 74–75 & 101). Aponte took the exam at a Pearson Vue testing center. (Def's Exs. 18–21). The center provided testing results immediately after an examinee completed the exam. (Doc. 71 at 85). If an examinee passed, the center would have immediately given him his 2-20 license. (*Id.* at 104).

While Aponte did not possess a 2-20 license during his B&B employment, he had previously obtained a 4-40 property and casualty license in 2006. (Doc. 70 at 24–26 ; Doc. 71 at 8 & Pl's Ex. 4). A key difference between the two licenses is how the sale is made. A 4-40 license limited Aponte to only conducting inside sales. (Doc. 70 at 25–26). In other words, Aponte could not solicit business and had to wait for customers to approach him. For example, at B&B, he would take telephone calls requesting insurance quotes or other B&B employees might bring him a lead from one of their commercial accounts of someone who was interested in obtaining personal lines insurance and Aponte would talk to the client. (*Id.*) In contrast, a 2-20 license allows its holder to solicit customers, or conduct outside sales. (*Id.* at 22–23). An employee exceeding the scope of his license would lead to the State of Florida disciplining the employee and his employer. (*Id.* at 22). During Aponte's B&B employment, he only conducted inside sales and did not exceed the scope of his 4-40 license. (*Id.* at 27 & 77). The 2-20 license is a B&B requirement. (Doc. 70 at 25, 75–76, 122, & 207–208; Doc. 71 at 101–102 & Pl.'s Ex. 8).

On July 19, 2016, Tina Cockayne, an Accounting-Team Resources Associate, emailed Aponte to remind him of the licensing requirement and to advise him to contact her or Beck if he anticipated any issues with the October 5 deadline.[4] (Doc. 70 at 176–178; Doc. 71 at 63–64 &

---

[4] At the time, her job title was Accounting-Compensation Associate. (Doc. 70 at 146–147). Although, her title has changed, her duties have not. (*Id.* at 147).

Defendant's Exhibit 7 at 2 ("Def.'s Ex.")). It is part of her job duties to monitor the licensing requirements of B&B employees. (Doc. 70 at 130 & 175–176). She primarily handles payroll and some human resources duties but has no managerial responsibilities at B&B, such as making the decision to terminate an employee's employment. (*Id.* at 117–118 & 174–175). Aponte received the email but did not respond as the email did not request a response. (*Id.* at 177–178; Doc. 71 at 64 & Def.'s Ex. 7). In August 2016, Aponte began to study three to four hours a day for the exam. (Doc. 71 at 69–70 & 103–104).

On September 22, 2016, Cockayne emailed Aponte again, requesting an update on his 2-20 license progress. (Doc. 70 at 49 & 178; Doc. 71 at 64 & Def.'s Ex. 7 at 1–2). He failed to respond to the email. (Doc. 70 at 178; Doc. 71 at 64 & Def.'s Ex. 7). On October 3, 2016, two days before the deadline, Cockayne emailed Beck about Aponte's license status. (Doc. 70 at 50–52, 121–122, 179–181, & Def.'s Ex. 7 at 1). She informed Beck that Aponte had failed to respond to her previous emails regarding his 2-20 license progress and she had contacted the Florida Department of Insurance. (Doc. 70 at 180, 192–193, & Def.'s Ex. 7 at 1). She learned that Aponte had taken no steps to obtain his 2-20 license: he had not taken the required course, exam, nor been fingerprinted. (Doc. 70 at 179–181 & Def.'s Ex. 7 at 1). Cockayne also stated: "[t]his matter creates both internal and legal non-compliance issues. It is extremely important that either Angel's position is consistent with a 440 license, or that he obtain the 220 license immediately." (Def.'s Ex. 7 at 1). Cockayne copied Matulis and Graham Kolterjohn, B&B's Senior Vice President in the Orlando office, on the email. (Doc. 70 at 50–51,141–142, & Def.'s Ex. 7 at 1).

When the October 5 deadline came, Aponte had not obtained a 2-20 license. (Doc. 71 at 65). Aponte still had not made any effort to complete the requirements to obtain a 2-20 license because he could not afford the course and exam. (*Id.* at 65–71). Despite Cockayne's July 19, 2016 email advising Aponte to notify Beck or Cockayne if he had any issues with the deadline, in

October 2016, Aponte first informed Beck that he had financial issues and could not pay for both the course and the exam. (Doc. 70 at 48 & 60; Doc. 71 at 65–71 & Pl's Ex. 17). On October 23, 2016, Matulis emailed Beck, inquiring as to why Aponte had not responded to Cockayne's October 3 email or taken any steps to obtain his 2-20 license.[5] (Doc. 70 at 52, 121–122, & Def's Ex. 7 at 1). Instead of terminating Aponte's employment, B&B offered to pay for his course and exam. (Doc. 70 at 33; Doc. 71 at 69). In October 2016, Aponte enrolled in a course paid for by B&B. (Doc. 70 at 78; Doc. 71 at 28 & 69).[6]

On November 17, 2016, B&B promoted Aponte to the Personal Lines Representative position and he received a merit pay increase authorized by Matulis. (Doc. 70 at 124–126, 137–138 ; Doc. 71 at 69 & Pl's Ex. 11). B&B promoted Aponte because a federal guideline required B&B to review all of its employees and to make either a status change from exempt to non-exempt or position changes in compliance with federal law. (Doc. 70 at 125). Aponte still worked in the Personal Lines Department and reported to Beck. (Pl's Ex. 10). On November 17, 2016, Aponte signed a job description for this position. (*Id.*) The job description did not specifically state that a 2-20 license was required but generally stated that a "Property and Casualty license" was required. (*Id.*) However, Aponte understood that this meant that he was still required to obtain a 2-20 license. (Doc. 71 at 69).

As Aponte's course was eight weeks long, he was unable to take the exam in October and November 2016 as he had to complete the course first. (Doc. 71 at 29). He completed the course in December 2016. (*Id.* at 29 & 104). However, he was unable to take the exam in December 2016 because there were no spots available for that month. (*Id.* at 29). Aponte booked his first exam for January 2017. (*Id.*) On January 11, 2017, Aponte took and failed the exam, scoring a 60%. (Doc.

---

[5]Matulis also sent this email to Cockayne and Kolterjohn. (Def's Ex. 7).
[6]Aponte testified that although B&B paid for his course, it did not pay for his exams. (Doc. 71 at 38 & 69).

70 at 55; Doc. 71 at 70–71 & Def's Ex. 18). On January 20, 2017, Beck provided Aponte with a performance evaluation. (Doc. 70 at 60–63; Doc. 71 at 71–73 & Pl's Ex. 14). Beck communicated to him that he was required to obtain his 2-20 license as soon as possible. (Doc. 70 at 62; Doc. 71 at 72 & Pl's Ex. 14). On the performance evaluation form, it stated "Obtain 220- this is required asap" and Beck rated Aponte "some, but below level required for role" in the "Licensing and educational requirements" category, commenting that he was "working on acquiring his 220 license." (Pl's Ex. 14 at 1–2). Aponte signed the evaluation. (*Id.* at 2–4).

In late January 2017 or early February 2017, Matulis met with Beck to evaluate the performance of the employees in her department.[7] (Doc. 70 at 55–57 & 126). They discussed Aponte's licensing issue. (*Id.* at 126–127). Matulis directed Beck to inform Aponte that if he did not pass his next exam, B&B would terminate his employment. (*Id.* at 56–57 & 127–128). On January 31, 2017, Aponte took the exam and failed for the second time, earning a 61%. (Doc. 71 at 74 & Def's Ex. 19).

On February 2, 2017, instead of following Matulis' instructions, Beck spoke to and emailed Aponte about the licensing situation, offering him a 30-day probationary period to obtain his 2-20 license or he would be terminated. (Doc. 70 at 30–31; Doc. 71 at 76–77 & Pl's Ex. 17). In the email, Beck stated that "I have decided to give you an additional 30 days from today, not a day more to acquire your 2-20 License by 3/2/2017." (Pl's Ex. 17). Beck handwrote "3/3/17" on the email and both she and Aponte signed it. (Doc. 70 at 64–65; Doc. 71 at 24 & Pl's Ex. 17). However, thirty days from February 2, 2017, was March 4, 2017, a Saturday. (Doc. 70 at 31 & 88; Doc. 71 at 24). Matulis learned about the email and Beck's deadline. (Doc. 70 at 32–33, 78, & 92). On February 18 and 24, 2017, Aponte took the exam and failed both times, scoring a 67% and

---

[7]Matulis testified that it occurred in late January and Beck testified that it occurred on February 2, 2017. (Doc. 70 at 55–57 & 126).

65%, respectively. (Doc. 71 at 81, 83, & Def.'s Exs. 20 & 21). While employed at B&B, Aponte failed the exam a total of four times. (Doc. 71 at 71, 74, 81,83, & Def's Exs. 18–21).

During the week of February 20, 2017, Matulis directed Cockayne to contact Aponte on March 3, 2017 to inquire whether Aponte had obtained his 2-20 license. (Doc. 70 at 130–131, 161, & 183–184). Matulis told her that if Aponte did not have the license on that day, Cockayne was to communicate Matulis' decision to terminate Aponte's employment. (*Id.* at 130–131, 161, & 183–184).

On February 24, 2017, Aponte booked a 2-20 exam for his fifth and final attempt for Friday, March 3, 2017, at 1:30 p.m. (Doc. 71 at 25–26 & Pl's Ex. 18). Two days later, on February 26, 2017, Aponte became ill. (Doc. 71 at 26). His ulcerative colitis had flared up. (*Id.* at 71 at 93–95). Aponte noticed blood in his stool and started feeling abdominal pain. (*Id.* at 26). He began going to the restroom more frequently and was unable to walk. (*Id.*) Previously in 2013, Aponte was diagnosed with ulcerative colitis. (*Id.* at 27). Ulcerative colitis is a disease which affects the colon, intestines, and abdomen. (Doc. 70 at 34; Doc. 71 at 27 & 32).

On February 27, 2017, Aponte was admitted to the hospital and was discharged on March 2, a total of four days. (Doc. 44 at 37; Doc. 70 at 33–34; Doc. 71 at 30–31 & 35). This was the first time that he had been hospitalized during his B&B employment. (Doc. 71 at 35). Aponte did not foresee his hospitalization. (*Id.* at 24 & 77). On February 27, 2017, Matulis first learned of Aponte's hospitalization. (Doc. 70 at 95). While Aponte was in the hospital, Beck visited him. (*Id.* at 33–36). From February 28 to March 1, Beck exchanged emails with Cockayne about Aponte's status. (*Id.* at 36–37 & Pl's Ex. 19). Beck informed Cockayne that Aponte had undergone a colonoscopy and biopsy and was waiting for the results. (Pl's Ex. 19).

On Thursday, March 2, 2017, Aponte was released from the hospital. (Doc. 71 at 31). He was unable to drive himself home because he was on multiple medications. (*Id.* at 31–32). On

March 3, 2017, Aponte was physically and mentally unable to sit for his scheduled 2-20 exam. (*Id.* at 31–34). He was experiencing pain in his stomach, feeling dizzy from his medications, and frequently using the bathroom. (*Id.* at 32–34). On that same date at 11:46 a.m., Aponte emailed Cockayne. (Doc. 70 at 152; Doc. 71 at 35–36 & Pl's Ex. 22). The emailed stated:

> Tina,
>
> I would like to know how can I file for a medical leave of absence (FMLA) [b]ecause of the recent stress I'm still in quite a bit of pain and unable to come to work [.] I have a follow-up appointment next Thursday. My results were not good and I'd rather not go into detail. My [d]octor can provide any information you may need. Please advise as to what would be the next steps.

(Pl's Ex. 22 at 1–2). Upon receiving the email, Cockayne contacted Brian Pinkalla, Director of Team Resources, Employment Practices, for guidance. (Doc. 70 at 152–154, 185–187, 210 & 212–214). Pinkalla provided consulting services for human resources-related issues to B&B offices (*Id.* at 210), but he did not possess the authority to change a manager's disciplinary decision and lacked the power to terminate or discipline anyone other than employees under his direct supervision. (*Id.* at 221–222). Per Pinkalla's request, at 12:00 p.m., Cockayne forwarded Beck's February 2 probation email to Pinkalla. (*Id.* at 152–153,185–187, 212–214 & Pl's Ex. 23). Cockayne and Pinkalla spoke on the phone about the situation. (*Id.* at 185–187 & 212–214). Pinkalla told her that Aponte's licensing situation and his FMLA request were separate issues as the decision had already been made to terminate Aponte based on his failure to obtain a 2-20 license. (*Id.* at 152–154, 186–187, 217, & 232–233). Therefore, Pinkalla told Cockayne that she could proceed with communicating Matulis' decision to terminate Aponte if he failed to obtain the license. (*Id.* at 152–154 & 186–187).

Later that afternoon, Cockayne and Aponte spoke on the telephone. (Doc. 70 at 161–163 & 187–188; Doc. 71 at 37). Cockayne asked Aponte whether he had the license and he said no. (Doc. 70 at 161–163 & 187–188). Cockayne then informed Aponte that his employment with B&B

was terminated as result of his failure to acquire a 2-20 license. [8] (*Id.* at 161–163 & 187–188). At 3:32 p.m., Cockayne emailed Aponte, stating that he had been terminated for failure to acquire his 2-20 license. (Doc. 70 at 161, 187–188, & Pl's Ex. 22). After his termination, he never took the exam again. (Doc. 71 at 100–102). At the time of the trial, Aponte had never obtained his 2-20 license. (*Id.* at 102).

## II. PROCEDURAL HISTORY

On January 31, 2018, Aponte filed his four-count complaint against B&B, alleging that B&B violated the FMLA (Counts I and II); the Florida Civil Rights Act, Fla. Stat. §§ 760.01 *et seq.* ("FCRA") and the Americans with Disabilities Act, 42 U.S.C.A. §§ 12101 *et seq.* ("ADA") (Counts III and IV). (Doc. 1). On October 1, 2018, both parties filed their respective motions for summary judgment (Doc. 25; Doc. 26). While B&B moved for summary judgement on all the claims (Doc. 25), Aponte only moved for partial summary judgment on certain issues. (Doc. 26). The Court granted in part and denied in part both parties' motions. (Doc. 52). As to B&B's motion, the Court granted the motion as to Count II, Count III, and Count IV. (*Id.* at 37).The Court also granted summary judgment on certain claims in Count I but denied summary judgment on Aponte's FMLA interference claim based on B&B terminating him after he requested FMLA leave because under *Martin v. Brevard County Public School*, 543 F.3d 1261 (11th Cir. 2008), the Court found that there was a genuine issue of material fact of whether B&B would have retained Aponte had he not been on FMLA leave and had the opportunity to take the exam during the days he was hospitalized, in the other words, whether B&B would have terminated Aponte regardless of his FMLA leave. (*Id.* at 20–23). This is the key issue left for the bench trial. As to Aponte's motion, the Court granted Aponte's motion on certain issues, finding that: (1) Aponte had a serious health condition under the FMLA; (2) Aponte was an FMLA-eligible employee and B&B was an FMLA-

---

[8] On the morning prior to Aponte's termination, B&B terminated Beck's employment. (Doc 70 at 39–40).

covered employer; and (3) Aponte suffered an FMLA-qualifying absence when he was interned and incapacitated in the hospital, and while he remained convalescing under doctors' care for at least one week post-hospitalization. (*Id.* at 38). The Court denied Aponte's motion as to B&B's affirmative defenses and back pay. (*Id.* at 37–38).

### III. CONCLUSIONS OF LAW

Aponte's remaining interference claim is based on B&B denying his FMLA request. To establish an FMLA interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (quoting *Strickland v. Water Works and Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206–07 (11th Cir. 2001)). The intent of the employer is irrelevant. *Id.* The FMLA grants an eligible employee the right to take up to twelve weeks of unpaid leave annually for several reasons, including a serious health condition that prevents the employee from performing the functions of his position. 29 U.S.C. § 2612(a)(1). Moreover, after the completion of FMLA qualified leave, eligible employees have the right "to be restored by the employer to the position held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). However, neither of these rights is absolute. An employer is not liable for an FMLA violation when it demonstrates by a preponderance of the evidence that it would have terminated the employee for reasons unrelated to the employee's request to commence FMLA leave or his taking of such leave. *See, e.g.*, *Krutzig*, 602 F.3d at 1236 ("[T]he right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."); *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001) ("An employer can deny the right to

reinstatement, however, if it can demonstrate that it would have discharged the employee had he not been on FMLA leave.") (citations omitted); *Eleventh Circuit Pattern Jury Instructions* (Civil Cases) § 4.16 at 3–4 (2018). Courts refer to this affirmative defense as the "same decision" defense. *See, e.g., Cooper v. Fulton Cty., Ga.*, 458 F.3d 1282, 1287 (11th Cir. 2006) (discussing the "same decision" defense); *Allen v. Butler Cty. Commissioners*, No. 1:05-CV-619, 2007 WL 9728531, at *1 (S.D. Ohio Sept. 13, 2007) (same).

Assuming *arguendo* that Aponte established his FMLA interference claim at trial, B&B is not liable and is entitled to judgment because it established its affirmative defense.[9] "[T]he unrebutted evidence that the decision maker was not aware, at the time of the decision to terminate [the employee] of [his] request to commence FMLA leave establishes as a matter of law that [the employee's] termination was for reasons other than [his] requested leave." *Krutzig*, 602 F.3d at 1236. Matulis' testimony shows that prior to Aponte's February 27, 2017 hospitalization and the March 3, 2017 FMLA request, Matulis decided at the latest during the week of February 20, 2017, to terminate Aponte on March 3, 2017, if he had not obtained his 2-20 license.[10] (Doc. 70 at 130–131). Cockayne's testimony corroborated this. (Doc. 70 at 161 & 183–184). The Court finds their testimony on this point to be credible. *See Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir.1993) ("[I]t is the exclusive province of the judge in non jury trials to assess the credibility of witnesses

---

[9]At trial, B&B argued that Aponte had not established an FMLA interference claim because his FMLA leave was not the proximate cause of his termination. (Doc. 71 at 124–125). However, "a causal nexus is not an element of an interference claim, but that the employer can raise the lack of causation as an affirmative defense." *Spakes v. Broward Cty. Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir. 2011). Therefore, B&B's argument is best suited to support its affirmative defense, not to determine whether Aponte established his interference claim.

[10]The Court states "at the latest" as this was the time Matulis directed Cockayne to call Aponte on March 3, 2017, to inquire about his 2-20 license status and notify Aponte of Matulis' decision to terminate him if he had not obtained the license. (Doc. 70 at 130–131, 161, & 183–184). Moreover, it is clear from the record that Matulis was the decisionmaker as to Aponte's termination, while Cockayne and Pinkalla were merely facilitators or conduits of Matulis' decision. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997) (holding that an employee functioning as "a facilitator or conduit only" is not a true decisionmaker). Cockayne and Pinkalla lacked the power to terminate Aponte and were merely carrying out Matulis' decision. (Doc. 70 at 117–118, 174–175, & 221–222).

and to assign weight to their testimony."). At trial, Aponte provided no evidence to rebut this testimony. In fact, Aponte testified that he did not foresee his hospitalization and it would have been impossible for anyone at B&B to foresee his need for medical leave. (Doc. 71 at 24 & 77). If Aponte could not foresee his own hospitalization prior to the March 3 deadline, then it is highly unlikely that Matulis would have foreseen it when he told Cockayne to contact Aponte. Aponte also testified that this was his first hospitalization during his B&B employment. (*Id.* at 35). Moreover, prior to Aponte's hospitalization, Matulis, the decisionmaker, told Beck in late January or early February 2017 that Aponte would be terminated if he failed the exam again (and he failed two more times) but his friend Beck gave him the 30-day probation instead. (Doc. 70 at 55–57 & 126–128).Therefore, B&B established that it would have terminated Aponte for his failure to obtain his 2-20 license by March 3, 2017, regardless of his FMLA request or hospitalization.[11] *See, e.g.*, *Guzman v. Brown Cty.*, 884 F.3d 633, 639–40 (7th Cir. 2018) (" [I]t is undisputed that the decision to terminate her was made before Peltier had any knowledge that Guzman had requested FMLA leave or believed that she had sleep apnea. Guzman therefore cannot establish that she was denied FMLA benefits to which she was entitled."); *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015) ("If the evidence shows that a decisionmaker was unaware of an employee's request to take FMLA leave at the time of the decision to terminate the employee, the employer is entitled to summary judgment.")[12]; *Krutzig*, 602 F.3d at 1236 (affirming the granting of summary judgment in favor of employer on an FMLA interference claim because the decisionmaker was unaware of the employee's FMLA request at the time he made the decision to terminate the employee); *Ezzard v. Eatonton-Putnam Water & Sewer Auth.*, No. 5:11-CV-505

---

[11]The Court declines the parties' invitation to speculate on whether Aponte would have passed the exam on his fifth attempt. Moreover, while the parties debate this issue, the Court emphasizes that Matulis did not state that Aponte had to pass the exam by March 3, 2017, but that he had to obtain his 2-20 license by March 3, 2017 or be terminated.

[12]Unpublished opinions of the Eleventh Circuit constitute persuasive, not binding, authority. *See* 11th Cir. R. 36-2 and I.O.P. 6.

CAR, 2013 WL 5438604, at *12 (M.D. Ga. Sept. 27, 2013) (holding that the employee's FMLA interference claim failed because the unrebutted evidence demonstrated that two of the decisionmakers terminated the employee without knowledge of his FMLA request); *Odom v. Wal-Mart Stores E., LP*, No. 2:09-CV-02251-HGD, 2012 WL 13026655, at *9 (N.D. Ala. Mar. 6, 2012) (granting summary judgment in favor of the employer because it was undisputed that the person who made the decision to transfer the plaintiff was unaware of the plaintiff's exercise of rights under the FMLA at the time this decision was made), *report and recommendation adopted*, No. 2:09-CV-02251-SLB-HGD, 2012 WL 13027291 (N.D. Ala. Mar. 31, 2012).

Aponte makes numerous unpersuasive arguments. Aponte heavily relies on *Martin v. Brevard County Public School*, 543 F.3d 1261 (11th Cir. 2008). (Doc. 70 at 9–10 & 12; Doc. 71 at 109–116; Doc. 74 at 12–13). At summary judgment, the Court was bound by *Martin* and denied B&B summary judgment on the remaining FMLA interference claim based on B&B's denial of his FMLA request because it found that under *Martin* there existed a genuine issue of material fact of whether B&B would have retained Aponte had he not been on FMLA leave and had the opportunity to take the exam during the days he was hospitalized. (Doc. 52 at 21–22). In *Martin*, the Eleventh Circuit reversed the Court's grant of summary judgment on the plaintiff's FMLA interference claim because it found that the record did not establish *beyond dispute* that the employer would have terminated the plaintiff had he not taken FMLA leave. *Martin,* 543 F.3d at 1267 (emphasis added). Therefore, it held that there was a genuine issue of material fact concerning the plaintiff's FMLA interference claim. *Id.* However, this case is past the summary judgment stage and the Court conducted a bench trial. "[I]n the case of a bench trial, the fact finder is the district court." *United States v. Dickstein*, 436 F. App'x 980, 987 (11th Cir. 2011) (citation omitted). Thus, the Court is no longer bound by *Martin*.[13] Furthermore, at the summary judgment

---

[13]Similarly, the Court is unpersuaded by Aponte's reliance on *Parris v. Miami Herald Publishing Co.*, 216

stage, "courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party. . . [e]ven though the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) (citations and internal quotation marks omitted). At a bench trial, the Court is not required to do this. *See Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009) ("After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error.") (citation omitted). Moreover, despite Aponte's arguments to the contrary, at trial, B&B was only required to prove by preponderance of the evidence that it would have terminated Aponte regardless of his FMLA request, not beyond dispute. *Eleventh Circuit Pattern Jury Instructions* (Civil Cases) § 4.16 at 3–4 (2018); *Third Circuit Pattern Jury Instructions* (Civil Cases) § 10.1.1 at 11 (2018); *Eighth Circuit Pattern Jury Instructions* (Civil Cases) § 14.01 at 14–12 (2018).

Focusing on B&B's Seventh Affirmative Defense, Aponte also contends that B&B did not plead its "same decision" affirmative defense in its Answer and Affirmative Defenses as to Aponte's FMLA "denial claim." (Doc. 56 at 13). Aponte characterizes its claim as a FMLA denial claim despite the Courts explanation in its Summary Judgment Order that Aponte's claim based on B&B's denial of his FMLA request constitutes an FMLA interference claim. (Doc. 52 at 13 n.8). Assuming *arguendo* that B&B did not raise the "same decision" affirmative defense as to Aponte's FMLA interference claim in its Answer and Affirmative Defenses, the Eleventh Circuit has stated that "the purpose of Rule 8(c) is to give the opposing party notice of the affirmative

---

F.3d 1298 (11th Cir. 2000) and *Strickland v. Water Works and Sewer Board of City of Birmingham*, 239 F.3d 1199 (11th Cir. 2001), as they were decided at the summary judgment stage. The Court also rejects Aponte's reliance on *Paylor v. Hartford Fire Insurance Co.*, 748 F.3d 1117 (11th Cir. 2014), which involved a former employee's signing of a severance agreement purporting to waive any FMLA claims she may have had against her former employer, as it is factually distinguishable from the present case.

defense and a chance to rebut it," and, as a result, "if a plaintiff receives notice of an affirmative defense by some means other than the pleadings, 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.'" *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir.1989) (quoting *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir.1988)). In *Grant*, the defendant raised the statute of limitations defense for the first time in a motion for summary judgment filed approximately one month before trial. *Id.* The court held that because the plaintiff was "fully aware" that the defendant intended to rely on the defense, and because the plaintiff did not assert any prejudice from the lateness of the pleading, the defendant's failure to comply with Rule 8(c) did not result in a waiver. *Id.* at 797–98. In the present case, Aponte received notice of B&B's "same decision" affirmative defense as to his FMLA interference claim at least six months prior to trial when B&B filed its summary judgment motion on October 1, 2018, arguing that it was entitled to summary judgment on Aponte's FMLA interference claims because it would have terminated Aponte regardless of his FMLA leave.[14] (Doc. 25 at 13–14). Aponte does not allege any prejudice. *See Tri-Lady Marine, Ltd. v. Bishop Mech. Servs., LLC*, No. 18-14956, 2019 WL 1386181, at *2 (11th Cir. Mar. 27, 2019) (relying on *Grant*). At summary judgment, Aponte objected on the merits and did not argue that B&B did not plead the defense as to his FMLA interference claims. (Doc. 32 at 11–14; Doc. 37 at 7–8). Next, Aponte once again characterizes its claim as an FMLA denial claim and argues that the "same decision" affirmative defense does not apply to such claims. (Doc. 56 at 13). As the Court explained *supra*, Aponte's claim based on B&B's denial of his FMLA request constitutes an FMLA interference claim. As the cases cited *supra* illustrate, the "same decision" affirmative defense applies to FMLA interference claims.

---

[14]B&B re-argued this point in its Response to Aponte's Partial Motion for Summary Judgment. (Doc. 31 at 15–16).

Without citing to any authority, Aponte requests that the Court conclude that the "same decision" affirmative defense only relates to monetary damages. (Doc. 56 at 13). The Court declines to do so. *See Pier v. Advance/Newhouse, P'ship*, No. 8:13-CV-1052-T-33TGW, 2014 WL 12573540, at *7 (M.D. Fla. Mar. 5, 2014) (granting summary judgment on an FMLA interference claim where the plaintiff sought money damages and reinstatement because the employer established that it terminated the plaintiff's employment for a reason unrelated to the plaintiff's exercise of his FMLA rights), *report and recommendation adopted*, No. 8:13-CV-1052-T-33TGW, 2014 WL 12575827 (M.D. Fla. Mar. 25, 2014). Therefore, the Court also denies Aponte's request for equitable relief. (Doc. 56 at 16–17).[15] Aponte contends that B&B has a heavy burden to prove its affirmative defense. (Doc. 56 at 13; Doc. 74 at 10–11 & 15–16). However, as the Court discussed *supra*, B&B only needed to prove its affirmative defense under the preponderance of the evidence standard, which it has done. Aponte suggests that the affirmative defense does not apply in this case because he was not terminated for misconduct nor was he laid off. (Doc. 56 at 14). The affirmative defense is not limited to these circumstances. There is no limitation on what the reasons may be as long as they are not related to the employee's request to commence FMLA leave or his taking of such leave.[16] The Court does not sit "as a 'super-personnel department,' and

---

[15] Aponte relies on *Matthews v. Village Center Community Development District.*, No. 5:05-CV-344-OC-10GRJ, 2006 WL 3422416, (M.D. Fla. Nov. 28, 2006), to argue that he is entitled to equitable relief regardless of the existence of monetary damages. (Doc. 56 at 16–17; Doc. 74 at 21–22). However in *Matthews*, the court held that the plaintiff's FMLA interference claim based on the plaintiff not being reinstated to her position could not go forward because the employer had shown that it would have refused to reinstate the employee for a reason wholly unrelated to her FMLA leave. *Matthews*, 2006 WL 3422416, at *19. Similar to the present case, the plaintiff in *Matthews* also sought equitable relief, such as reinstatement. *(Id.* at Doc. 14).

[16] Similarly, Aponte also argues that he is entitled to judgment in his favor because B&B's reason for his termination does not fit any of the circumstances listed in 29 CFR § 825.216. (Doc. 71 at 110–111; Doc. 74 at 15). However, the regulation's language indicates that it is a non-exhaustive list of examples. *Venegas v. Aerotek, Inc.*, No. 14 C 9829, 2016 WL 4140828, at *2 (N.D. Ill. Aug. 2, 2016) ("Indeed, the Department of Labor's regulations interpreting the FMLA provide three *non-exhaustive examples* of when an employer may properly terminate an employee without violating the FMLA . . . .") (emphasis added). Moreover, Aponte, relying on 29 U.S.C. § 2614(b)(1)(A), also argues that B&B never asserted that restoring Aponte would cause B&B "substantial or grievous economic injury." (Doc. 74 at 12). However, the statute does not state that this is the only circumstance that would allow an employer to lawfully deny an employee's right to restoration. In addition, the statute only protects those employees who meet the definition of an "eligible employee" as defined by 29 U.S.C. § 2614(b)(2). *See* 29 U.S.C. § 2614(b)(1)(A). Aponte does not argue that he fits the definition.

it is not [the Court's] role to second-guess the wisdom of an employer's business decisions. . . ." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir.2000)). As Aponte stated in his closing argument, "[t]he employer is allowed to set its requirements for its position." (Doc. 71 at 114).

## IV. CONCLUSION

Based on the foregoing, it is ordered as follows:

1. The Court finds in favor of the Defendant Brown & Brown of Florida, Inc. Accordingly, the Clerk is **DIRECTED** to enter judgment for the Defendant.

2. The clerk is **DIRECTED** to close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on May 23, 2019.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record